# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JEFFREY STEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-cv-0189 (TSC) |
| | ) | |
| | ) | |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Jeffrey Stein brought this action under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552, *et seq.*, challenging certain responses to a series of FOIA requests he

submitted to nine federal agencies (collectively, "Defendants"): Central Intelligence Agency

("CIA"), Department of Justice ("DOJ"), Department of Defense ("DOD"), Office of Personnel

Management ("OPM"), Office of the Director of National Intelligence ("ODNI"), Department of

Education ("Education"), Department of State ("State"), and Department of Commerce

("Commerce").

Before the court are Defendants' Motion for Summary Judgment (ECF No. 22) and

Stein's Cross-Motion for Partial Summary Judgment (ECF No. 29). Upon consideration of the

motions, the responses and replies thereto, and for the following reasons, the court will GRANT

and DENY Defendants' motion in part, and GRANT and DENY Stein's motion in part.

## I.    BACKGROUND

### A.  Stein's FOIA Requests

1

Stein's FOIA requests broadly fall into two categories, each involving alleged security concerns related to Donald Trump's presidential campaign and presidential transition. First, Stein's "briefing requests" sought "copies of all records, including e-mails and other forms of electronic communications, about national security briefings given or to be given to Donald Trump due to his Presidential candidacy," including any security concerns related to such briefing. (ECF No. 22-13 ("Defs. Stmt. Mat. Facts") ¶ 1.) The request stated that agencies could "exclude the substance of the briefings and focus only on records about logistics, security concerns, and similar issues." (*See, e.g.*, ECF No. 22-7, Ex. YYY at 1.) It further clarified that "Mr. Stein has no interest in learning what Mr. Trump is briefed about; he is only interested in the process, and he is specifically interested in records discussing any security concerns." (*Id.*) Stein sent briefing requests to five agencies: CIA, DOD, DOJ, FBI,[1] and ODNI. (Defs. Stmt. Mat. Facts ¶¶ 3, 22, 31, 42, 51.) Three agencies—CIA, FBI, and ODNI—identified and produced some records in response to the request. (*Id.* ¶¶ 5, 33, 46.)

The second category of Stein's FOIA requests, the "investigation requests," sought information related to background investigations of fifteen individuals reportedly under consideration for senior positions in the Trump administration. (*Id.* ¶¶ 1–2.) The requests sought "copies of all records, including emails, about any steps taken to investigate or authorize (or discussions about potentially investigating or authorizing) [the individual in question] for access to classified information." (*Id.*) The fifteen individuals are: Stephen Bannon, Pamela Bondi, Betsy DeVos, Carly Fiorina, Gen. Michael Flynn, Michael Flynn, Jr., Rudolph Giuliani, Jared Kushner, James Mattis, Gen. David Petraeus, Wilbur Ross, Jr., Rex Tillerson, Donald

---

[1] In the interest of clarity, the court will treat the FBI as a separate agency from DOJ, as the FBI has its own FOIA office and processed requests independently of other DOJ components. (*See* ECF No. 22-7 ("Hardy Decl.") ¶¶ 1–3.)

Trump, Jr., Eric Trump, and Ivanka Trump. (*Id.* ¶ 2.) Four agencies—CIA, FBI, ODNI, and OPM—received investigation requests for all fifteen individuals. (*Id.* ¶¶ 3, 31, 42, 54.) Commerce, DOD, Education, and State received investigation requests for a subset of between one and thirteen individuals. (*Id.* ¶¶ 17, 22, 28, 61.) Ultimately, three agencies—CIA, FBI, and ODNI—identified and released some material responsive to Stein's briefing or investigation requests. (*Id.* ¶¶ 5, 33, 46.)

### B. Agency Responses to Stein's FOIA Requests[2]

#### 1. CIA

CIA received the briefing request from Stein on May 5, 2016, and all fifteen investigation requests between December 5 and December 15, 2016. (ECF No. 22-3, Ex. 1 ("Shiner Decl.") ¶ 7.) After Stein sued on January 31, 2017, CIA searched for responsive materials in accordance with the schedule established by this court, and produced materials to Stein on a rolling basis, releasing its final set of records on March 16, 2018. (*Id.* ¶ 9.) In all, CIA identified 65 responsive documents, produced 40 documents in whole or in part and withheld 25 in full, invoking Exemptions 1, 3, 5, and 6. (Defs. Stmt. Mat. Facts ¶¶ 5, 7, 9, 11, 14; ECF No. 22-3, Ex. A ("CIA *Vaughn* Index").) CIA referred additional responsive materials to other agencies and eventually produced eight of the referred documents, which included redactions made by the originating agency. (Shiner Decl. ¶ 9.)

---

[2] Because Stein does not object to summary judgment as to Commerce on Count 24, (ECF No. 28 ("Pl. Opp.") at 1 n.1), the court need not discuss Commerce's responses to his requests. *See* discussion in section III, *supra*.

2. FBI

FBI processed 352 pages of materials responsive to Stein's requests; it released 100 pages in full, 163 pages with redactions, and withheld 89 pages in their entirety, invoking Exemptions 5, 6, and 7(c).  (Defs. Stmt. Mat. Facts ¶¶ 33–36.)

3. DOJ

On July 22, 2016, Stein's counsel sent a copy of the briefing request to DOJ's FOIA/PA Mail Referral Unit ("MRU"), a part of DOJ's Justice Management Division that accepts FOIA requests from requesters who are unsure which DOJ component may possess the records they seek.  (ECF No. 22-9, Ex. 7 ("Brinkmann Decl.") ¶¶ 3, 6.)  When the MRU receives a request, it decides "which components would be most likely to maintain the records sought."  (*Id.* ¶ 7.)  After determining that the DOJ's Office of Information Policy ("OIP") was one of the agency components most likely to have materials responsive to Stein's request, MRU forwarded the request to OIP.  (*Id.*)  On April 17, 2017, OIP notified Stein's counsel that the agency had completed a search and could not locate any responsive records.  (*Id.* ¶ 12.)  OIP claims that it searched for responsive materials in all locations reasonably likely to contain them.  (Defs. Stmt. Mat. Facts ¶ 52.)

4. DOD

*i. Office of the Secretary of Defense and Joint Staff*

The FOIA office for the Office of the Secretary of Defense and Joint Staff ("OSD/JS"), a component of DOD, received a copy of Stein's briefing request on May 5, 2016, and in a May 23, 2016 letter to Stein's counsel, issued a "no records" response to the briefing request.  (*Id.* ¶ 23; ECF No. 22-5, Ex. 3 ("Herrington Decl.") ¶ 6.)  Stein did not appeal this response.  (Defs. Stmt. Mat. Facts ¶ 24).  However, on July 22, 2016 he e-mailed the OSD/JS action officer who

had sent the May 23 response, stating that his e-mail was "a renewal of the FOIA request submitted on 5 May 2016." (Herrington Decl. ¶ 7).  On July 27, 2016, the officer responded that the previous FOIA request was closed and that Stein should file another request online, or by mail or fax to the OSD/JS Requester Service Center ("RSC").  (*Id.*)  Later that day, Stein's counsel again e-mailed the action officer and asked him to forward the request to OSD/JS's FOIA office.  (*Id.*)  The officer replied on July 28, again instructing Stein's counsel to "[p]lease submit your own FOIA request to the Requester Service Center as stated below."  (*Id.* ¶ 8.)  The parties now dispute whether Stein's counsel's e-mails constituted a separate submission of the briefing request.  (Defs. Stmt. Mat. Facts ¶ 25; ECF No. 28 ("Pl. Response to Defs. Stmt. Mat. Facts") ¶ 25.)

Stein's counsel also submitted thirteen investigation requests to OSD/JS, which claims that it found no responsive records, despite searching all locations reasonably likely to contain them.  (Defs. Stmt. Mat. Facts ¶¶ 26, 27)

### ii.  Defense Manpower Data Center

Stein's counsel submitted the same thirteen investigation requests sent to OSD/JS to the DOD's Defense Manpower Data Center ("DMDC"), which is responsible for maintaining the Joint Personnel Adjudication System ("JPAS") and other personnel security systems. (Herrington Decl. ¶ 14.)  Because DMDC responds to FOIA requests through the OSD/JS FOIA office, these requests were "essentially duplicates" of the ones Stein sent to OSD/JS.  (*Id.*) Relying on a DMDC official's statement that "the JPAS database does not maintain security investigations of cabinet level personnel, and thus no system of records at DMDC would have responsive material," DMDC concluded that it would not have any JPAS information responsive

to Stein's thirteen investigation requests, and communicated a "no records" response to the OSD/JS FOIA office.  (*Id.*)

5.  ODNI

ODNI received the briefing request and all fifteen investigation requests from Stein. (Defs. Stmt. Mat. Facts ¶ 42.)  With respect to the investigation requests, the agency determined that it "was not required to conduct a search for responsive records" because "ODNI is not involved in the process of actually investigating or authorizing individuals for access to classified national security information."  (ECF No. 22-8 ("Gaviria Decl.") ¶ 39.)  It also cited Exemption 6 to justify withholding 31 pages of responsive records it received via referral from the CIA, claiming that the records contained no reasonably segregable and non-exempt information.  (*Id.* ¶¶ 48, 50.)  The agency concluded that there were no locations likely to contain information responsive to Stein's investigation requests, because ODNI "does not investigate or authorize individuals for access to classified information."  (*Id.* ¶¶ 44–45.)

6.  OPM

OPM referred Stein's investigative requests to the National Background Investigations Bureau ("NBIB"), an OPM component that "conducts background investigations for Federal government agencies to use as the basis for suitability and security clearance determinations." (ECF No. 22-10 ("Watters Decl.") ¶¶ 8, 12.)  NBIB determined that its Personnel Investigations Processing System, which includes information about individuals subject to background investigations, was the only location likely to contain responsive records.  (*Id.* ¶¶ 8, 12.)

On January 26, 2017, NBIB e-mailed Stein, informing him that it had found no responsive materials for ten of the fifteen investigation requests.  (*Id.* ¶ 15.)  NBIB identified no responsive records for two additional investigation requests, but, due to an administrative

oversight, it did not communicate these results to Stein until May 2017. (*Id.* ¶ 16). NBIB located nine pages of materials responsive to the remaining three investigation requests, but cited Exemptions 6 and 7(C) to justify withholding these records in full. (Defs. Stmt. Mat. Facts ¶¶ 57–58; Watters Decl. ¶ 24.) It also communicated these decisions to Stein via e-mail on January 26, 2017. (Watters Decl. ¶ 21.) All thirteen response letters sent to Stein on January 26, 2017 notified him of his right to appeal the decision and explained the proper appeal procedures, while also stating that OPM's FOIA office would perform a separate search of records for responsive materials. (*Id.*) The e-mails from NBIB to which the formal response letters were attached referred to the decisions as both "interim" and "final." (*See* ECF No. 22-10, Exs. 2, 4.) Stein did not appeal the response letters he received on January 26, 2017 and filed this suit three days later. (Watters Decl. ¶¶ 18–19.)

  7. <u>State</u>

  State received three investigation requests from Stein on December 6, 2016. (ECF No. 22-12, Ex. 10 ("Eric Stein Decl.") ¶¶ 4, 8, 12.) State's Office of Information Programs and Services ("IPS") located information responsive to the investigation request regarding Rex Tillerson, but found no responsive materials for the other two requests. (*Id.* ¶¶ 52.) In July and August 2017, IPS notified Stein that its search of agency records had identified 22 responsive records. (Eric Stein Decl. ¶¶ 15–17.) State ultimately released two documents in full, eighteen documents in part, and withheld two documents in full, citing Exemptions 6, 7(C), and 7(E), and claimed that there was no reasonably segregable, non-exempt information in the withheld materials. (Defs. Stmt. Mat. Facts ¶¶ 63, 65–66.) State also informed Stein that it had referred nineteen documents to FBI for review. (Eric Stein Decl. ¶ 17.)

  8. <u>Education</u>

On December 5, 2016, Stein's counsel submitted one investigation request to Education seeking records on steps taken to investigate or authorize Betsy Devos, President-elect Trump's nominee for Secretary of Education, for access to classified information. (ECF No. 22-6 ("Senecal Decl.") ¶ 3.) On February 22, 2017, after Stein filed suit, Ronald Luczak, then the director of Education's Office of Security, Facilities, and Logistics, informed Education's FOIA Service Center that the agency had no records responsive to Stein's request. (*Id.* ¶ 4.) Education asserts that there were no locations within the agency that were likely to have responsive records because the agency "does not conduct background investigations for cabinet secretaries or cabinet secretary nominees and therefore did not have the responsibility for conducting Ms. Devos's background check." (Defs. Stmt. Mat. Facts ¶ 29–30.)

## C. Procedural History

Stein seeks an order directing Defendants to release all requested records, as well as injunctive and/or declaratory relief, costs/attorney's fees, and any other relief the court deems just and proper. (ECF No. 1 ("Compl.").) His Amended Complaint alleges records denials and expedited processing denials in 26 counts against various Defendants. (ECF No. 6 ("Am. Compl.").) The court entered a standing FOIA order on April 28, 2017, directing the parties to meet and confer to propose a schedule for proceeding with the case. (Apr. 28, 2017 Min. Order.) The parties submitted several status reports between May 2017 and April 2018 providing the court with updates on agencies' responses to Stein's requests and proposing briefing schedules. (*See* ECF Nos. 9, 10, 11, 14, 16, 17, 18.) On March 30, 2018, they notified the court that Defendants had completed all production of non-exempt portions of responsive records. (ECF

No. 17 at 1.)  The parties then submitted the cross-motions for summary judgment that are now

before the court.[3]

## II.    LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989,

991 (D.C. Cir. 2002).  A court may enter summary judgment on a "claim or defense . . . or [a]

part of each claim or defense."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" only "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A dispute is "material" only when it

involves facts "that might affect the outcome of the suit under the governing law."  *Id.* at 248.

"[F]actual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment

determination."  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Liberty Lobby*,

477 U.S. at 248).  The party seeking summary judgment "bears the heavy burden of establishing

that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog,*

*Inc., v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

In considering a motion for summary judgment, the court must view all facts in the light

most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

---

[3] After both parties submitted summary judgment motions, Stein moved to strike portions of
various agency declarations, claiming they contained inadmissible legal arguments.  (ECF No.
31.)  The court denied Stein's motion, reasoning that "[t]o the extent that Defendants'
declarations contain legal arguments, the court will reach its own legal conclusions and regard
the statements in the declarations as explanations of the declarant's understanding of the issues
of the case."  (July 6, 2018 Min. Order.)

475 U.S. 574, 587 (1986).  The moving party "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of the 'pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits . . .'

which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*,

477 U.S. at 323.  The nonmoving party's opposition must be supported by affidavits,

declarations, or other competent evidence setting forth specific facts showing that there is a

genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

### B.  FOIA

"FOIA provides a 'statutory right of public access to documents and records' held by

federal government agencies.'"  *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't

of Justice*, 602 F. Supp. 2d 121, 123 (D.D.C. 2009) (quoting *Pratt v. Webster*, 673 F.2d 408, 413

(D.C. Cir. 1982)).  Federal agencies must comply with FOIA requests to make their records

available to the public unless the requested "information is exempted under [one of nine] clearly

delineated statutory [exemptions]."  *Id.* (internal quotation marks omitted); *see also* 5 U.S.C.

§§ 552(a)–(b).

Agencies have "an obligation under FOIA to conduct an adequate search for responsive

records," *Edelman v. S.E.C.*, 172 F. Supp. 3d 133, 144 (D.D.C. 2016), and "[a]n inadequate

search for records constitutes an improper withholding" under the statute.  *Schoenman v. F.B.I.*,

764 F. Supp. 2d 40, 45 (D.D.C. 2011).  When a FOIA requester challenges an agency's response,

the agency "must show beyond material doubt . . . that it has conducted a search reasonably

calculated to uncover all relevant documents."  *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344,

1351 (D.C. Cir. 1983).  The court employs a reasonableness test to determine whether an

agency's search for responsive materials is adequate.  *Rodriguez v. Dep't of Defense*, 236 F.

Supp. 3d 26, 34 (D.D.C. 2017) (citing *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998)). "[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Guillermo Felipe Duenas Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). However, "evidence that relevant records have not been released may shed light on whether the agency's search was indeed inadequate." *Weisberg*, 705 F.2d at 1351.

"An agency may establish the adequacy of its search by submitting reasonably detailed, nonconclusory affidavits [or declarations] describing its efforts." *Baker & Hostetler LLP v. United States Dep't of Commerce*, 472 F.3d 312, 318 (D.C. Cir. 2006) (alteration in original). The court must accord agency affidavits "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Safecard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted). However, "it is well-established that a conclusory affidavit that gives 'no detail as to the scope of the examination . . . is insufficient as a matter of law' in demonstrating the adequacy of the search." *Am.-Arab Anti-Discrimination Comm. v. U.S. Dep't of Homeland Sec.*, 516 F. Supp. 2d 83, 87 (D.D.C. 2007) (quoting *Weisberg v. U.S. DOJ*, 627 F.2d 365, 370 (D.C. Cir. 1980)).

The district court conducts a *de novo* review of the government's decision to withhold requested documents under any of FOIA's specific statutory exemptions. *See* 5 U.S.C. § 552(a)(4)(B). The agency bears the burden of showing that the responsive material withheld falls within a stated exemption, *see Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing 5 U.S.C. § 552(a)(4)(B)), and its "justification for invoking a

FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Ayuda, Inc. v. FTC*, 70 F. Supp. 3d 247, 261 (D.D.C. 2014) (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Georgacarakos v. F.B.I.*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012) (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). Summary judgment for the agency is only appropriate when it proves that it has fully discharged its FOIA obligations. *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996). In considering a motion for summary judgment for the Defendant, the court analyzes all underlying facts and inferences in the light most favorable to the FOIA requester. *Unrow Human Rights Impact Litig. Clinic v. United States Dep't of State*, 134 F. Supp. 3d 263, 271 (D.D.C. 2015). A motion for summary judgment should be granted in favor of the FOIA requester, however, only "[w]hen an agency seeks to protect material which, even on the agency's version of the facts falls outside the proffered exemption[.]" *Coldiron v. U.S. Dep't of Justice*, 310 F.Supp.2d 44, 48 (D.D.C.2004) (quoting *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C.Cir.1992)).

### III.    ANALYSIS

Stein does not challenge the agencies' responses to many of his FOIA requests. (ECF No. 28 ("Pl. Opp.") at 7–8.) With two exceptions, he does not contest the responses that CIA, FBI, OSD/JS, MRU/OIP, and ODNI provided for his briefing requests (Counts 1, 3, 4, 6, and 8). (*Id.*) The two exceptions are Stein's claims (1) that OSD/JS improperly refused to process his request on the grounds that it was not properly submitted, and (2) that NBIB's response to his briefing request did not qualify as a final determination requiring him to exhaust his administrative remedies before filing suit. (Pl. Opp. at 8–11.) Additionally, Stein does not contest the adequacy of the searches conducted by State (Count 23) and Commerce (Count 24) in

response to his investigation requests, (*id.* at 1 n.1, 8), and only objects to certain exemptions that

CIA, FBI, OPM, ODNI, and State invoked to justify withholdings.  (*Id.*)[4]

While "a motion for summary judgment cannot be 'conceded' for want of opposition,"

*Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016), "[t]his does not mean

. . . that the Court must assess the legal sufficiency of each and every [claim] invoked by the

government in a FOIA case."  *Shapiro v. United States Dep't of Justice*, 239 F. Supp. 3d 100,

106 n.1 (D.D.C. 2017).  In *Shapiro*, the court held:

> Where the FOIA requester responds to the government's motion for summary
> judgment without taking issue with the government's decision to withhold or to
> redact documents, the Court can reasonably infer that the FOIA requester does not
> seek those specific records or information and that, as to those records or
> information, there is no case or controversy sufficient to sustain the Court's
> jurisdiction.

*Id; see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Accordingly, the court will

address only Stein's arguments in response to Defendants' motion for summary judgment.

Stein also does not contest Defendants' argument that his expedited processing denial

claims are now moot because all Defendant agencies have issued a final decision on his requests.

(ECF No. 22-1 ("Defs. MSJ") at 28 n.10); *see Muttitt v. United States Dep't of State*, 926 F.

Supp. 2d 284, 296 (D.D.C. 2013) (holding that "the only scenario in which a court can properly

grant relief to a Freedom of Information Act (FOIA) requester on the merits of an expedited

processing claim is when an agency has not yet provided a final substantive response to the

individual's request for records") (internal quotation marks omitted).

The remaining disputes involve three broad legal issues: (1) the adequacy of certain

agency searches or decisions not to search, (2) the legality of the withholdings of responsive

---

[4] Stein does not contest any Defendant's decision to withhold responsive records pursuant to
Exemptions 1, 3, and 5.  (*See* Defs. MSJ at 28–34.)

materials, and (3) two threshold questions regarding Stein's duty to exhaust his administrative remedies before filing suit. The court's analysis organizes the outstanding issues according to each agency.

## A. <u>CIA</u>

Although Stein does not challenge the CIA's search or withholdings in response to his briefing request, (*see* Pl. Opp. at 7–8), he challenges CIA's response to his investigation requests, alleging that CIA (1) presented insufficient evidence describing certain aspects of its searches and the rationale for certain withholdings, (2) improperly withheld responsive records, and (3) failed to release all reasonably segregable responsive material. (*Id.* at 13–16, 24–26, 27–28.)

### 1. <u>CIA presented sufficient evidence describing the searches it conducted.</u>

Stein contends that CIA did not adequately describe its search of the Office of Security ("OS") in response to his investigation requests. (Pl. Opp. at 16.) Stein acknowledges that CIA's declaration provides "a thorough discussion of [its] search" of one agency database, but claims that the declaration addressed only half the search, because it described only "[t]he primary database searched by OS," and CIA stated that it "searched personnel reviewing holdings from two electronic databases." (*Id.*; Shiner Decl. ¶ 12.) CIA then submitted a supplemental declaration confirming that each relevant electronic database "was searched using the search terms and date range described in the First Declaration," (ECF No. 39-1 ("Suppl. Shiner Decl.") ¶ 3), and explaining that the second database "is an electronic repository used to store, among other things, documents collected or produced during security clearance processing." (*Id.* ¶ 5.)

Stein's argument is unconvincing. In quoting from the first Shiner Declaration, he ignores its statement that CIA employed the search terms for "*each* of the relevant electronic records and email systems searched." (Shiner Decl. ¶ 14) (emphasis added). Further, the agency's supplemental declaration confirms that it used the same search terms for each database. (Suppl. Shiner Decl. ¶ 3.) The level of detail in Shiner's description of the second database closely mirrors her description of the primary database. (*See* ECF No. 39 ("Defs. Reply") at 20.) Given Stein's concession that CIA provided a "thorough" description of its search of the primary database, (Pl. Opp. at 16), the court is not persuaded by his attempt to now argue that the agency failed to provide enough information because it did not disclose the names of the two systems. (ECF No. 43 ("Pl. Reply") at 9.) Moreover, Stein provides no case law suggesting that an agency must disclose the names of the databases it searches. CIA has therefore offered satisfactory descriptions of the databases it searched for responsive records.

2. <u>CIA adequately described the records it withheld from Stein's investigation requests.</u>

Stein claims that CIA presents no non-conclusory evidence detailing the records it withheld in response to his investigation requests or the reasons these records were exempt from disclosure. (Pl. Opp. at 11.) He argues that CIA's declaration and *Vaughn* index do not show why the claimed exemptions apply to the material found in documents 43–64. (*Id.* at 13.)

"'A district court may grant summary judgment to the government in a FOIA case only if the agency affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed.'" *PHE, Inc. v. United States Dep't of Justice*, 983 F.2d 248, 250 (D.C. Cir. 1993) (quoting *King v. United States Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987)). An affidavit is "clearly inadequate" if it merely includes a "categorical

description of redacted material coupled with categorical indication of anticipated consequences of disclosure." *PHE, Inc.*, 983 F.2d at 250; *see also King*, 830 F.2d at 223–24 (holding that, "for each withholding," an agency "must discuss the consequences of disclosing the sought-after information").

CIA has provided affidavits which adequately provide sufficient information and detail to explain the reasons for nondisclosure. The *Vaughn* index for documents 43–64 provides, for each document, (1) a brief label describing the document type (e.g. "email"), (2) the exemption justifying the withholding, (3) a short overview of the statutory purpose and scope of the claimed exemption, and (4) language stating that CIA reviewed the document and determined that it contained no non-exempt and reasonably segregable information that CIA could release. (ECF No. 22-3, Ex. A ("CIA *Vaughn* Index") at Nos. 43–64.)

CIA's *Vaughn* index and initial declaration addressed the records by category, rather than by document. (*See* Shiner Decl. ¶¶ 20–24, 26, 31.) As such, there is merit to Stein's argument that neither the declaration nor the index "describe *each* document or portion thereof withheld," *King*, 830 F.2d at 223 (emphasis in original), such that the agency meets its burden "of demonstrating applicability of the exemptions invoked *as to each document or segment withheld*." *Id.* at 224 (emphasis in original). That deficiency, however, is remedied by Shiner's supplemental declaration, which includes additional descriptions for each of the 22 challenged documents and explains why the claimed exemption applies to specific documents. (Suppl. Shiner Decl. ¶¶ 6–10.) While Shiner groups the records according to shared characteristics, she provides additional information about each of the 22 documents, identified by their *Vaughn* index number. (*Id.*) The supplemental declaration describes each document "in enough detail

16

and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed." *PHE, Inc.*, 983 F.2d at 250.

For the reasons set forth above, CIA's description of the documents is far more specific than the "vague and conclusory" affidavit language that the D.C. Circuit has found inadequate. *PHE, Inc.*, 983 F.2d at 252. Therefore, the agency has presented enough evidence explaining the reasons for withholding the documents at issue.

### 3. CIA improperly withheld responsive records pursuant to Exemption 6.

Stein contends that CIA improperly withheld documents 43–64 for alleged privacy reasons. (Pl. Opp. at 24.) He only addresses Exemption 6 in his opposition brief; he does not dispute CIA's claims that it properly withheld responsive records under Exemptions 1, 3, and 5. (*Id.* at 24–26; Defs. MSJ at 28–34.)[5]

Exemption 6 excludes "personnel and medical files and similar files" when the disclosure of such files "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The term "similar files" is construed broadly to cover "[a]ll information which applies to a particular individual . . ., regardless of the type of file in which it is contained." *Milton v. United States Dep't of Justice*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011) (quoting *Washington Post Co. v. United States Dep't of Health & Human Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982)). "The information in the file 'need not be intimate' for the file to satisfy the standard, and the threshold for determining whether information applies to a particular individual is minimal." *Milton*, 783 F. Supp. 2d at 58 (quoting *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1006 (D.C. Cir. 1990)). CIA's initial declaration states that "several of the documents at issue,

---

[5] Although Defendants' reply brief discusses "the CIA's Exemption 6 and Exemption 7(C) withholdings," (Defs. Reply at 22), CIA never cited Exemption 7(C) to justify withholding records. (*See* Shiner Decl. ¶¶ 9–20; Defs. MSJ at 40–41.)

used in the clearance process, contain large volumes of personally identifiable information, including names, social security numbers, addresses, and credit histories." (Shiner Decl. ¶ 31.) Based on this information, CIA has shown that the records it withheld "appl[y] to a particular individual" and thus meet Exemption 6's threshold requirement.

Because the information CIA withheld is in a file covered by Exemption 6, the court must conduct a balancing test to determine whether disclosure would constitute a "clearly unwarranted invasion of personal privacy." *Painting & Drywall Work Pres. Fund, Inc. v. Dep't of Hous. & Urban Dev.*, 936 F.2d 1300, 1301 (D.C. Cir. 1991). This involves weighing the individual privacy interests in the requested information against the public interest in disclosure. *Id.* at 1302. "[T]he only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would serve the core purpose of the FOIA, which is contributing significantly to public understanding of *the operations or activities of the government*." *United States Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994) (internal quotation marks and citations omitted) (emphasis in original); *see also Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 34 (D.C. Cir. 2002) ("[U]nless a FOIA request advances the citizens' right to be informed about what their government is up to, no relevant public interest is at issue.") (internal quotation marks and citation omitted). A FOIA requester bears the burden of identifying an overriding public interest and demonstrating that disclosure would further that interest. *Milton*, 783 F. Supp. 2d at 58.

Stein does not dispute that the balancing test favors nondisclosure of the names and identifying information of CIA employees and third parties. (*See* Pl. Opp. at 26.) Rather, he claims that Exemption 6 does not warrant withholding the names of the fifteen investigated individuals, arguing that merely disclosing their names would not constitute a clearly

unwarranted violation of their privacy.[6] (*Id.* at 25–26.) The court agrees. This scenario does not present strong interests on either side of the balancing test. Disclosing the investigated officials' names hardly implicates "weighty" privacy interests. *Judicial Watch, Inc. v. United States Dep't of State*, 282 F. Supp. 3d 36, 44 (D.D.C. 2017) (applying Exemption 6 to a report that "contained personal information pertaining to [a named employee's] relationships, character assessments, financial details, and medical information") (internal quotation marks omitted). The court sees no reason why the release of the fifteen individuals' names, without more, "would be reasonably likely to subject [the named] individuals or those associated with them to increased harassment or threats." (Shiner Decl. ¶ 32.) Revealing the identities of public officials receiving security clearance investigations, unlike the identities of subjects of criminal investigations, would not "subject those identified to embarrassment and potentially more serious reputational harm." *Safecard Servs.*, 926 F.2d at 1205 (finding a "substantial" privacy interest in protecting from disclosure the identity of a subject in a criminal investigation).

Nor, however, is there a particularly compelling public interest on the other side of the scale. Releasing redacted documents that reveal nothing but the individuals' names would not shed much light on CIA's operations if, as Stein claims, the fact that they were investigated for

---

[6] Stein relies on Shiner's statement that "Exemption 6 applies to the *names and identifying information* of CIA employees and the *names* of non-agency personnel appearing in the records," which indicates that CIA only applied the exemption to the names of the fifteen individuals. (Shiner Decl. ¶ 33) (emphasis added.) It is unclear exactly what information about the fifteen individuals the withheld records contain. CIA asserts that many of the documents contain "personally identifiable information about private individuals" but it does not specify if this withheld information consists of names, other identifying information, or both. (Suppl. Shiner Decl. ¶¶ 7–10). Shiner notes that the withheld documents relating to the security clearance process "contain large volumes of personally identifiable information, including names, social security numbers, addresses, and credit histories." (Shiner Decl. ¶ 31.) Any records containing social security numbers or credit card histories would almost certainly relate to the subjects of the investigations. Shiner also states that two of the responsive documents—entries 43 and 60— "contain the names of . . . private citizens." (Suppl. Shiner Decl. ¶ 6.)

security clearances "is a matter of record." (Pl. Opp. at 26.) However, because of the negligible privacy interests in the names alone, and because disclosing this limited information would convey some information about CIA's relevant activities by confirming that the agency conducted security clearance investigations for the named individuals, the balance tips in favor of disclosure. Consequently, the court will grant Stein summary judgment with respect to these challenged withholdings.

Because this holding obligates the CIA to produce additional documents, the court need not consider at this juncture Stein's claim that CIA failed to release all reasonably segregable, non-exempt information from documents 43–64.

**B. FBI**

Stein argues that the FBI (1) interpreted his investigation requests too narrowly; (2) failed to adequately support its responses to two investigation requests; (3) improperly invoked Exemptions 6 and 7(C) to justify withholding responsive records; and (4) failed to release all reasonably segregable, non-exempt material. (Pl. Opp. at 17–18, 23–24, 26–28.)

1. FBI reasonably interpreted Stein's investigation requests.

Stein's investigation requests sought information regarding the "steps taken to investigate or authorize" the fifteen individuals for "access to classified information." (Defs. Stmt. Mat. Facts ¶ 1.) The FBI concluded that the data or results of the background investigations were non-responsive. (Defs. MSJ at 39; Defs. Reply at 10.) It thus limited its search to information about the process the agency followed in conducting security clearance investigations or authorizations. (*Id.*)

"[A]n agency [] has a duty to construe a FOIA request liberally," *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), and it must "select the

interpretation that would likely yield the greatest number of responsive documents." *Rodriguez*, 236 F. Supp. 3d at 36. "The agency must be careful not to read the request so strictly that the requester is denied information the agency well knows exists in its files, albeit in a different form from that anticipated by the requester." *Hemenway v. Hughes*, 601 F. Supp. 1002, 1005 (D.D.C. 1985). At the same time, however, it is "bound to read [the request] as drafted, not as either agency officials or [the requester] might wish it was drafted." *Miller v. Casey*, 730 F.2d 773, 774 (D.C. Cir. 1984); *see also Kowalczyk v. United States Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996) ("[T]he [agency] is not obliged to look beyond the four corners of the request for leads to the location of responsive documents.")

FBI properly interpreted Stein's requests. The plain meaning of "copies of all records, including emails, about any *steps taken* to investigate or authorize (or discussions about potentially investigating or authorizing) [an individual] for access to classified information" reasonably encompasses information about FBI's investigatory process. (Hardy Decl., Ex. A) (emphasis added). It does not extend to the data or results of the investigations. *See McClanahan v. United States Dep't of Justice*, 712 F. App'x 6, 8 (D.C. Cir. 2018) (finding that FBI properly applied a similarly narrow interpretation of a FOIA request when the requester "sought documents about the FBI's *investigation* into his possession of classified information, not 'documents about the classified information' itself"). If Stein intended for his request to cover such information, he should have made a specific request; FBI's interpretation was not unreasonable merely because the agency declined to look beyond the text and construe the

requests as broadly as Stein would like. *Miller*, 730 F.2d at 774.[7] Consequently, FBI's search for records responsive to the investigation requests was adequate on these grounds.

2. <u>FBI's "no records" responses to two investigation requests were inadequate to support summary judgment in its favor.</u>

In *Weisberg*, 705 F.2d 1344, the D.C. Circuit noted that "there may be times when an agency's inability to retrieve documents known or thought to be in its files is inherently unbelievable." *Id.* at 1351. Stein claims FBI's conclusion that it did not have responsive records for the investigation requests for Ivanka Trump and Michael Flynn, Sr. meets this standard. (Pl. Opp. at 23–24.)

At first glance, FBI's searches for records responsive to these two investigation requests appear to have been adequate. As the Hardy Declaration explains, FBI employed the same search method—a three-way phonetic search—for each of the fifteen individuals named in Stein's investigation requests. (Hardy Decl. ¶ 107.) This methodology confirmed that six of the individuals had been the subjects of FBI background investigations within the specified time frame (July 1, 2016–May 25, 2017). (*Id.*) Further, Stein offers no reason why FBI's search method would not discover responsive records for Ivanka Trump and Michael Flynn, Sr. when it yielded records for six others named in the investigation requests.

Stein does, however, present "evidence that relevant records have not been released," which the D.C. Circuit has recognized "may shed light on whether the agency's search was indeed inadequate." *Weisberg*, 705 F.2d at 1351. He calls attention to two news articles reporting that Ivanka Trump was in the process of receiving a security clearance by March 2017.

---

[7] Contrary to Stein's argument, his asserted public interest in disclosure—"serious concerns about granting [the named individuals] access to information classified in the interest of national security"—does not support a broader reading of his requests when the plain language of the requests is limited to records about the investigatory process. (Pl. Opp. at 19–20.)

(*See* Pl. Opp. at 23–24.) He also notes two queries in NBIB's Clearance Verification System about Michael Flynn, Sr.'s clearance in August 2016 and October 2016, indicating that Flynn was undergoing a background investigation during this time. (*Id.*) In light of this evidence, FBI's explanation for the lack of responsive records—the "relatively narrow timeframe" spanned by the requests—is unconvincing.

Supported by these facts, Stein's argument is considerably more credible than a "purely speculative claim [] about the existence and discoverability of other documents." *Safecard Servs.*, 926 F.2d at 1200. He casts enough doubt on the presumption of good faith accorded to FBI's declaration to preclude summary judgment for FBI as to these two requests, and the court will therefore direct FBI to submit an additional declaration explaining its search methodology for the two requests.

Finally, because this further search may yield additional records that the agency finds are subject to an exemption, the court will defer ruling on FBI's other withholdings, and the question of segregability, to a later date.

## C. **DOD (OSD/JS)**

DOD moves for summary judgment because Stein failed to exhaust his administrative remedies. (Defs. MSJ at 13–15.) While Stein concedes that he never appealed the "no records" response he received from the OSD/JS FOIA office on May 23, 2016,[8] (Herrington Decl. ¶ 6; Am. Compl. ¶ 75), he argues that his subsequent e-mails to the OSD/JS action officer on July 22 and July 27, 2016 constituted a separate FOIA request that OSD/JS then refused to process. (Pl. Opp. at 8–10.) DOD counters that Stein's attempts to renew his previous request were not

---

[8] Stein does not challenge DOD's claim that OSD/JS's search for responsive records was adequate. (*See* Pl. Opp. at 8–10; Defs. Reply at 4.) He does, however, allege that DMDC, a component of DOD, failed to conduct a reasonable search. *See* section III.D.1–2, *supra*.

properly submitted because his e-mail did not comply with the agency's regulations for submitting FOIA requests. (Defs. MSJ at 14.)

The D.C. Circuit has long recognized that when a FOIA requester receives an adverse response from an agency, "exhaustion of administrative remedies is generally required before filing suit in federal court . . ." *Oglesby v. United States Dep't of the Army*, 920 F.2d 57, 61 (D.C. Cir. 1999). In order to qualify as a separate FOIA request, Stein's July 2017 e-mails must have been submitted "in accordance with published rules stating the time, place, fees (if any), and procedures to be followed." 5 U.S.C. § 552(a)(3)(A). "An agency's obligation under the FOIA does not arise . . . until a proper request is received." *Thomas v. Fed. Commc'ns Comm'n*, 534 F. Supp. 2d 144, 145 (D.D.C. 2008).

The July 22 and 27 e-mails from Stein's counsel did not comply with DOD's regulations for submitting FOIA requests, which require FOIA requests to be addressed to a FOIA Requester Service Center ("RSC"). DOD Manual 5400.07 § 3.1(c). A published DOD regulation dictates that "[a]ll DoD RSCs have the capability to receive requests electronically either through email or a web portal," 32 C.F.R § 286.2(a), and Section 3.3(b)(1) of the DOD Manual 5400.07 requires each RSC website to provide "[t]he address, telephone number, facsimile number, and organizational e-mail address to which the public can send FOIA requests." Stein's counsel sent the two e-mails to an individual action officer, not to an organizational e-mail address authorized to receive requests pursuant to 32 C.F.R § 286.2(a) and Section 3.3(b)(1) of DOD Manual 5400.07. (Herrington Decl. ¶ 7.) Although the OSD/JS action officer did not provide an organizational e-mail address among the options for submitting a proper FOIA request, and Defendant does not indicate that one was publicly available, the action officer provided instructions for submitting a request via the web portal. (*Id.* ¶¶ 7–8). Stein was familiar with the

portal, having used it to submit the first version of his briefing request to OSD/JS on May 5, 2016. (*See* Am. Compl. ¶ 71.) Thus, his attempts to renew his briefing request to OSD/JS did not constitute a new, subsequent FOIA request to which the agency was obligated to respond. Because Stein chose not to administratively appeal the OSD/JS FOIA office's response to his initial briefing request, summary judgment for DOD is appropriate on this issue.

### D.  DOD (DMDC)

Stein challenges DMDC's decision to not search various databases for records responsive to his investigation requests. (Pl. Opp. at 18–19.) He argues that DMDC, like FBI, interpreted the requests too narrowly, (*id.*), and improperly refused to search its JPAS database and three other records systems under its control. (*Id.* at 19 n.10, 21–23.)

### 1.  DMDC reasonably interpreted Stein's investigation requests.

As the court found with regard to Stein's claims against FBI, (*see*, *supra*, section III.B), it was reasonable for DMDC to interpret the scope of the requests to include only information related to the clearance investigation *process*, and not the data or results of these investigations. Noting that "the JPAS database does not maintain security investigations of cabinet level personnel (including the Secretary of Defense)," DMDC concluded that JPAS would not contain responsive records involving "steps taken to investigate or authorize" the named individuals for a security clearance. (ECF No. 38-2 ("Suppl. Herrington Decl.") ¶ 3.) The court is unpersuaded by Stein's argument that his request for the "steps taken" to process individuals for security clearances encompasses data produced during those investigations. (Pl. Opp. at 19.) Thus, the only remaining question is whether DOD's affidavit shows that a search of JPAS—or its other records systems—would be unnecessary.

### 2.  DMDC properly concluded that a search of JPAS would be futile.

Through affidavits or declarations, an agency can establish that "[a] search would have been futile" by showing that it "does not maintain any records" related to the subject of the request. *Cunningham v. United States Dep't of Just.*, 40 F. Supp. 3d 71, 85 (D.D.C. 2014), *aff'd*, No. 14-5112, 2014 WL 5838164 (D.C. Cir. Oct. 21, 2014). "The adequacy of [an] affidavit must be judged . . . in light of the entirety of its contents," *Am.-Arab Anti-Discrimination Comm.*, 516 F. Supp. 2d at 88, and a declarant's "familiar[ity] with the records that [the agency] maintains" is an important factor in determining the sufficiency of an agency's determination that a search is unnecessary. *Cunningham*, 40 F. Supp. 3d at 85; *see also Am.-Arab Anti-Discrimination Comm.* 516 F. Supp. 2d at 87–88 (finding satisfactory a declaration stating that Immigration and Customs Enforcement did not maintain information sought when the declarant was "presumed able to familiarize himself with the statistics ICE does and does not maintain," even though the operative statement was "akin to simple ipse dixit" and that its adequacy was "a close call").

DOD's declaration, like the declaration in *American-Arab Anti-Discrimination Committee*, does not "provide[] much insight as to what the [agency's] document location protocols are [or] how they were followed in this case." *Id.* at 88. With respect to JPAS, Mark Herrington, DOD's declarant, relies solely on DMDC's statement that the "database does not maintain security investigations of cabinet level personnel (including the Secretary of Defense)." (Herrington Decl. ¶ 14.) Although this is little more than an unsupported assertion, Herrington's stated familiarity with DMDC databases and with the DMDC official's conclusion provides enough indicia of reliability to provide a sufficient explanation for not searching JPAS. As Associate Deputy General Counsel in DOD's Office of General Counsel ("OGC"), Herrington is responsible for "coordinating [FOIA] searches across DOD to ensure thoroughness, reasonableness, and consistency." (Herrington Decl. ¶ 1.) He was the OGC counsel assigned to

this case and declares that he was familiar with JPAS and the DMDC official's rationale for declining to search this database. (*Id.* ¶¶ 2, 14; Suppl. Herrington Decl. ¶ 3.) Although it is a "close call," *Am.-Arab Anti-Discrimination Comm.* 516 F. Supp. 2d at 87, Herrington's Declarations, evaluated in light of his personal knowledge of JPAS and the communications from the DMDC official, adequately "explain why a search would be futile and is unnecessary." *Id.* at 88.

3. <u>DMDC has shown that searching additional databases under its purview would be futile.</u>

Stein claims that three other DMDC databases are likely to contain responsive records and should have been searched: the Defense Central Index of Investigations ("DCII"), the Defense Information System for Security ("DISS"), and the Improved Investigative Records Repository ("IIRR"). (Pl. Opp. at 21–22.) In response, Herrington submitted a supplemental declaration stating that the three databases "do contain information relating to security clearances and background investigations" but "would not have contained information about the steps taken to investigate or authorize for access to classified information the individuals specificed [sic] in Plaintiff's request." (Suppl. Herrington Decl. ¶ 3.)

While an agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested," *Oglesby*, 920 F.2d at 68, Herrington's second declaration provides enough evidence to show that none of the three additional databases are likely to contain records responsive to Stein's requests. DCII "is used as a central database for DOD conducted or sponsored investigations" but "would not include investigation of cabinet level officials." (Suppl. Herrington Decl. ¶ 4.) DISS "serves as the system of record for personnel security, security, suitability and credential management of all DOD employees; including military personnel, civilians, and DOD contractors" and "provides secure

27

communications between Adjudicators, Security Officers and Component Adjudicators in support of eligibility and access management." (*Id.* ¶ 5.) However, it does not "contain security investigation information regarding cabinet level officials." (*Id.*) Lastly, IIRR "only contains Personnel Security Investigations that were conducted prior to 2006—ten years prior to the time frame of Plaintiff's requests." (*Id.* ¶ 6.) For the reasons stated in the preceding discussion regarding JPAS, (*see supra* section III.D.1), the court concludes that the two declarations provide adequate explanation for DMDC's decision not to search the three databases. Stein's claims do not overcome the "presumption of good faith" that the court accords to DMDC's declarations. *Safecard Servs.*, 926 F.2d at 1200.

DMDC reasonably interpreted the investigation requests it received from Stein, and Herrington's declarations support the DMDC's determination that searching the JPAS, DCII, DISS, or IIRR databases would be unnecessary. Accordingly, the court will grant summary judgment to DOD as to this claim.

### E. **DOJ**

Stein does not contest the adequacy of OIP's search in response to his briefing request. (Pl. Opp. at 12 n.5.) Instead, he focuses on perceived inadequacies at the referral stage, arguing that the agency did not present "*any* evidence" supporting the MRU's determination that OIP and FBI were the only DOJ components likely to possess records responsive to Counts 3 and 11, respectively. (*Id.* at 12 (emphasis in original).)

Here, as with all FOIA searches, "the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Bartko v. United States Dep't of Justice*, No.13-1135, 2014 WL 12787219, at *2 (D.D.C. Aug. 25, 2014) (quoting *Weisberg v. Dep't of Justice*, 745 F.2d 1476,

1485 (D.C. Cir. 1984)).  DOJ's explanation as to why the MRU only referred the request to OIP is inadequate.  Vanessa Brinkmann's declaration states only that "the MRU determined that OIP was one of the components most likely to have records responsive to plaintiff's request." (Brinkmann Decl. ¶ 7.)  Brinkmann, who is Senior Counsel at OIP, part of DOJ's Justice Management Division, does not indicate whether she has any relationship with the MRU, or any personal knowledge about why MRU decided to refer the matter.  (Brinkmann Decl. ¶ 1.)  In this respect, this case is distinguishable from *Bartko*, where the court, in denying summary judgment to the Plaintiff in a dispute over an MRU referral, relied on a declaration submitted by an official in the Justice Management Division that explained the basis for the MRU's decision.  2014 WL 12787219 at *2.  Here, the declarations in the record fail to explain MRU's determination "in reasonable detail."  *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982).[9]

DOJ has also presented inadequate evidence justifying MRU's decision to refer the investigation requests to FBI.[10]  Other than a cursory statement in the May 18, 2017 Joint Status Report confirming that MRU referred the investigation requests to FBI, (ECF No. 9 at 4.), there is no evidence in the record explaining how or why MRU decided that FBI was likely to have responsive records.

---

[9] Stein also argues that MRU's finding that "OIP was one of the components most likely to have" responsive records was inadequate to justify referring the request only to OIP.  (Pl. Opp. at 12.)  But he supports this claim by making a false equivalence between an agency's referral of a FOIA request to a specific component and a search of a records systems within an agency component.  While the D.C. Circuit has held that only searching the *records systems* "most likely" to have responsive materials is inadequate, *Mobley v. CIA*, 806 F.3d 568, 582 (D.C. Cir. 2015) (citations omitted), it has not held that only referring to the *component* "most likely" to have responsive material is inadequate.  Moreover, DOJ regulations specifically instruct the MRU, upon receiving a FOIA request, to direct the request to the *agency component* "most likely" to possess responsive records, 28 C.F.R. § 16.3(a)(2) (emphasis added).

[10] As discussed in Section III.B.1, *supra*, FBI received all fifteen of Stein's investigation requests, so the MRU's referral created no new obligations for FBI.

For these reasons, DOJ is not entitled to summary judgement on Counts 3 or 11, and is directed to submit a supplemental declaration providing a more fulsome explanation for MRU's decision to refer the requests to FBI.

### F. **OPM/NBIB**

Stein and OPM dispute (1) whether Stein failed to exhaust his administrative remedies for certain investigation requests, (2) whether NBIB interpreted the scope of the investigation requests too narrowly, and (3) whether NBIB properly withheld responsive records pursuant to Exemptions 6 and 7(C).

    1.   Stein exhausted his administrative remedies for certain investigation requests he sent to OPM.

As a threshold matter, the parties disagree about whether Stein exhausted his administrative remedies for thirteen of the fifteen investigation requests he sent to OPM—ten resulting in "no records" responses and three for which NBIB withheld records in full. (Defs. MSJ at 15; Pl. Opp. at 10–11.) Stein argues that the response letters he received from NBIB were only interim responses, noting that the NBIB e-mails that accompanied the letters referred to the agency's response as "interim," and that each letter stated that another OPM FOIA office would perform an additional search. (Pl. Opp. at 10–11.) This, he argues, shows that NBIB's responses did not obligate him to exhaust his administrative remedies before filing suit. (*Id.* at 11.) NBIB, by contrast, argues that the letters constituted "final, appealable determinations" in response to Stein's requests that had to be appealed within 90 days. (Defs. MSJ at 15.)

"A response is sufficient for purposes of requiring an administrative appeal if it includes: the agency's determination of whether or not to comply with the request; the reasons for its decision; and notice of the right of the requester to appeal to the head of the agency if the initial agency decision is adverse." *Oglesby*, 920 F.2d at 65 (citing 5 U.S.C. § 552(a)(6)(A)(i)). "[I]f

there is a genuine dispute of material fact on the exhaustion issue, a court may refuse to grant summary judgment for the agency." *Pinson v. United States Dep't of Justice*, 61 F. Supp. 3d 164, 175 (D.D.C. 2015) (citing *Jones v. United States Dep't of Justice*, 576 F. Supp. 2d 64, 67 (D.D.C. 2008)).

Viewing the facts in the light most favorable to Stein, the court finds there is a genuine dispute of material fact regarding whether NBIB's responses to the thirteen investigation requests were adverse determinations that triggered the administrative appeal requirement. While the cover e-mails from NBIB classified the responses as "final," the simultaneous use of the word "interim," combined with the statement that the OPM FOIA office would continue searching for responsive materials, could cause a reasonable factfinder to conclude that OPM's response was not a sufficiently clear "determination of whether or not to comply with the request." *Oglesby*, 920 F.2d at 65. At least one other court has held that an agency's characterization of a FOIA response as "interim" does not give rise to the administrative appeal requirement, even when the response notifies the requester of his right to appeal. *Rosenfeld v. United States Dep't of Justice*, No. 07-3240, 2008 U.S. Dist. LEXIS 64620, at **23–24 (N.D. Cal. Aug. 22, 2008) ("Indeed, a FOIA claimant cannot be expected to assess the adequacy of a search that is not yet final."). While the formal letters from NBIB informed Stein of his right to appeal NBIB's responses, Defendant does not cite any agency regulations suggesting such notice is enough to transform a response into a final determination for which an administrative appeal is necessary.

Because there is a genuine disputed issue of material fact regarding whether NBIB's response letters triggered the administrative exhaustion requirement, the court will deny OPM's motion for summary judgment on this issue.

2. NBIB reasonably interpreted the scope of the investigation requests.

NBIB interpreted Stein's fifteen inquiries as "requests for records created by NBIB in conducting investigations on the subjects referenced and/or communications between NBIB and any other agency conducting investigations on the subjects." (Watters Decl. ¶ 12.) As with the other agency interpretations Stein challenges as too narrow, NBIB concluded that the requests did not encompass the information or data compiled during the background investigations. For the reasons previously set forth, the court finds that NBIB's interpretation was reasonable. As this is Stein's only challenge to the adequacy of OPM's search, (*id.*), the court will grant OPM's motion for summary judgment on this issue.

3. OPM has not shown that it properly withheld all contested records pursuant to Exemptions 6 and 7(C).

The nine pages that OPM withheld in full were responsive to Stein's investigation requests for Mattis (five pages), Flynn (two pages), and Ross (two pages). (Watters Decl. ¶ 24.) All are "Accountings of Certain Disclosures" maintained pursuant to 5 U.S.C. § 552a(c) ("Privacy Act of 1974"), containing personally identifiable records for all three individuals, the "date, nature, and purpose of each disclosure of information" maintained on each, and "the name and address of the person or agency to whom the disclosure was made." (*Id.* ¶¶ 27, 30, 33.) "These Disclosures are generated upon agencies accessing the records of individuals maintained in the PIPS [Personnel Investigations Processing System] for investigative information on the subject," which "include such information as the status of ongoing investigations, and the investigative history of the subject." (*Id.*)

Exemption 7(C) permits the withholding of records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," provided such records are "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(C). Once an agency makes a threshold

showing that it compiled the materials at issue for a law enforcement purpose, *Schoenman v. FBI*, 575 F. Supp. 2d 166, 174 (D.D.C. 2008), the court, as it does for Exemption 6, balances privacy interests against the public interest in disclosure. *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989). The balancing test tilts slightly towards nondisclosure under Exemption 7(C), which is broader than Exemption 6 in its protection of privacy. *Id.* at 756 (recognizing that Exemption 7(C) protects against disclosures that would result in an "unwarranted" invasion of privacy, while Exemption 6 imposes the added requirement that the invasion of privacy be "clearly unwarranted").

The Watters Declaration establishes that NBIB compiled the documents in question for a law enforcement purpose. Recognizing that "[t]he principal purpose of a background investigation is to ensure that a prospective employee has not broken the law or engaged in other conduct making her ineligible for the position," the D.C. Circuit held in *Mittleman v. Office of Pers. Mgmt.*, 76 F.3d 1240, 1243 (D.C. Cir. 1996), that "information obtained during OPM's background investigation was compiled for law enforcement purposes." *Id.* at 1241. Similarly, the documents withheld by NBIB relate to the security clearance investigations for Mattis, Flynn, and Ross (*see* Watters Decl. ¶¶ 12, 25, 27, 30, 33), and therefore satisfy Exemption 7(C)'s threshold requirement.

The court next balances Stein's asserted public interest in disclosure of the responsive records against the privacy interests in protecting them to determine if disclosure would result in an "unwarranted" privacy violation. *Davis v. United States Dep't of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992). As with Exemption 6 claims, "the only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be informed about what their government is up to." *Id.* In other words, there is a public interest in the disclosure of

official information that 'sheds light on an agency's performance of its statutory duties." *Beck v. United States Dep't of Justice*, 997 F.2d 1489, 1492–93 (quoting *Reporters Committee*, 489 U.S. at 773). Because records that "reveal[] little or nothing about an agency's own conduct" do not advance FOIA's statutory purpose, courts do not recognize a public interest in the disclosure of such information. *Beck*, 997 F.2d at 1493.

With respect to the personal identifying information contained in the documents, the balancing test favors OPM. For each of the three requests at issue, OPM properly determined that the personal identifying materials do not implicate an overriding public interest because they "do not contain information on the process or the risks associated with granting an individual a security clearance" and thus would not convey information about the agency's conduct. (Watters Decl. ¶¶ 28.) The D.C. Circuit has held that such information is "generally exempt from disclosure [under Exemption 7(C)] except, for example, where they are required to confirm or refute allegations of improper government activity." *Sussman v. United States Marshals Serv.*, 494 F.3d 1106, 1115–16 (D.C. Cir. 2007). Stein does not suggest that disclosing this information is "required to confirm or refute allegations of improper government activity." *Id.*

The portions of the withheld records noting the "date, nature and purpose of each disclosure" present a closer case. (Watters Decl. ¶¶ 27, 30, 33.) Without additional details about these records, the court lacks enough information to determine whether the public interest in this information outweighs the personal privacy interests in nondisclosure.

It is similarly unclear whether releasing details of the "date, nature and purpose of each disclosure" would satisfy Exemption 6's threshold requirement that records contain "personnel . . . [or] similar files." 5 U.S.C. § 552(b)(6). And even if it did, the court cannot conduct the

necessary balancing test without more specific factual support for withholding the information, and the privacy interests therein.

Therefore, the court will deny summary judgment to both OPM and Stein on this question, and order OPM to submit a supplemental declaration to more fully explain why the requested information is exempt under Exemption 6 and/or Exemption 7(C). The court will defer ruling on segregability until it has reviewed the supplemental declaration.

### G. **ODNI**

Stein does not dispute the adequacy of ODNI's search for records responsive to his briefing request or its withholding of information. (Pl. Opp. at 7–8; Defs. Reply at 5.) He does, however, raise three challenges to ODNI's response to his investigation requests, asserting that: (1) the agency's interpretation of his investigation request(s) was too narrow; (2) given the agency's interpretation of the requests, it improperly determined that a search of its records systems would be futile; and (3) ODNI officials withheld some responsive information located by CIA that was not covered by a FOIA exemption.

1.  ODNI reasonably interpreted Stein's investigation requests and properly determined that a search of agency records systems would be futile.

Because Stein's challenge to ODNI's decision not to search for information responsive to his investigation requests is "closely tied to the [interpretation] issue," the court considers the two questions together. (Pl. Opp. at 20.) To begin, the court finds that ODNI, like the other agencies, reasonably interpreted the investigation requests to encompass records about the process of conducting a security clearance investigation, and not data or results from the investigations. (Gaviria Decl. ¶¶ 41–42 (focusing on the "steps taken" to investigate or authorize the individuals for security clearances).) Based on its interpretation of the request, ODNI concluded that it "was not required to conduct a search for responsive records because it does not

conduct or authorize individuals for access to classified information." (*Id.* ¶ 44; *see also id.* ¶ 39 (explaining that a search of its databases was unnecessary because "ODNI is not involved in the process of actually investigating or authorizing individuals for access to classified national security information" and thus would not possess responsive records).)

Taken out of context, this reading of the requests appears to conflict with the directive that an agency "select the interpretation that would likely yield the greatest number of responsive documents," *Rodriguez*, 236 F. Supp. 3d at 36, especially given that CIA discovered responsive records in the ODNI databases. (Gaviria Decl. ¶ 44.) However, a closer look at the record shows that ODNI's decision not to search was reasonable. The Gaviria Declaration establishes that the Scattered Castles and Signal Flags databases are repositories of security data on individuals, and do not contain records of agency processes for security clearance investigations and/or authorizations. (*Id.* ¶¶ 41–42.) With respect to Scattered Castles, Gaviria explains that the database "does not . . . record the steps taken to investigate or authorize individuals for access to classified information. Rather, Scattered Castles is a database that consolidates personnel security records within the IC [Intelligence Community], which serves to support clearance and access reciprocity and act as a single source to determine who has access to classified information." (Gaviria Decl. ¶ 41.) Gaviria also states that "Signal Flags also does not contain records about the steps taken to investigate or authorize individuals for access to classified information" and that "the information gathered by the individual IC agencies in the process of determining eligibility for clearance . . . is maintained separately by those agencies, and is not maintained in the Scattered Castles or Signal Flags databases." (*Id.* ¶ 42.)

In other words, while the databases contain information that other agencies may use when conducting security clearance investigations, ODNI "simply maintains [the] shared databases."

(*Id.* ¶ 44.)  Given this limited role, the court agrees that ODNI "would have had no way of knowing what steps, if any, the CIA or any other agency took to investigate or authorize the individuals for access to classified information."  (*Id.*)  The kind of information that CIA referred to ODNI for processing supports this finding; the records consisted of "screenshots from the ODNI databases that CIA presumably searched in the process of approving the individuals' [sic] for access to classified information."  (*Id.* ¶ 45.)  This shows that any responsive records in Scattered Castles and Signal Flags are tied to an investigating agency's search of the databases, such as the CIA's search here.  On the other hand, ODNI is not involved in security clearance investigations or adjudications, and therefore a search of its databases would only reveal data that falls outside of the request's scope.  Thus, ODNI did not "read [Stein's] request so strictly that the requester is denied information the agency well knows exists in its files."  *Hemenway*, 601 F. Supp. at 1005.

Because the responsiveness of material in ODNI's databases depends on whether an agency used them during an investigation, ODNI has shown that it "does not maintain any records" responsive to Stein's investigation requests.  *Cunningham*, 40 F. Supp. 3d at 85. Accordingly, the court finds that ODNI conducted an adequate search for records responsive to the requests.

2.  <u>ODNI properly withheld records pursuant to Exemption 6.</u>

Citing Exemption 6, ODNI withheld 31 pages of records referred by CIA.  (Gaviria Decl. ¶ 47.)  The withheld pages are screenshots from the Scattered Castles and Signal Flags databases showing whether an individual had a security clearance at the time CIA searched the database. (*Id.* ¶¶ 49–51.)  Stein disputes ODNI's assertion that the question of whether someone has a

security clearance when the database is searched implicates a "substantial privacy interest" and that there is a "minimal public interest in disclosure." (Gaviria Decl. ¶ 49.)

Records of an individual's security clearance satisfy Exemption 6's threshold requirement that a record contain "personnel . . . files [or] similar files." 5 U.S.C. § 552(b)(6); *Hunt v. United States Marine Corps.*, 935 F. Supp. 46, 54–55 (D.D.C. 1996) (finding Exemption 6 applied to records that included, *inter alia*, information about security clearances); *see also United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982) (holding that all information that "applies to a particular individual" meets the threshold requirement for Exemption 6). Such records also implicate a "substantial privacy interest" because they "reveal significant personal data" about the individual. *Hunt*, 935 F. Supp. at 54 ("[T]here can be no reasonable dispute that [an individual] has a privacy interest in maintaining their confidentiality.")

The court must also weigh the privacy interests in the records against the public's interest in disclosure to determine if the invasion of privacy is "clearly unwarranted." 5 U.S.C. § 552(b)(6); *see also Painting & Drywall Work Pres. Fund*, 936 F.2d at 1302. Here again, the only relevant public interest is the extent to which the records would "contribut[e] significantly to public understanding of *the operations or activities of the government*." *United States Dep't of Def.*, 510 U.S. at 495 (emphasis in original). Here, the public has no overriding interest in disclosure with respect to ODNI. Because ODNI was not involved in conducting the background investigations, (Gaviria Decl. ¶ 44), it took no investigative "steps" that the records could reveal. Neither would disclosure of the 31 pages provide information on CIA operations that outweighs the "substantial privacy interest[s]" in the records. *Hunt*, 935 F. Supp. at 54. The screenshots of the databases merely reveal whether the individuals had security clearances when

CIA searched the database. (ECF No. 22-8, Ex. B ("ODNI Letter").) While a search of the database is a "step[] taken" to conduct a security clearance investigation, the screenshots offer very limited data points on the investigative process itself. The public interest in this information does not overcome the significant invasion of privacy inherent in disclosing the data on the individuals' security clearances.

For the reasons above, the court concludes that ODNI properly withheld the 31 screenshots it received via referral from CIA.

3. ODNI's declaration fails to support its conclusion regarding segregability.

FOIA requires an agency to produce "[a]ny reasonably segregable portion" of a record that is not exempt from disclosure. 5 U.S.C. § 552(b). *See Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("The focus of FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material.") More specifically, "[i]t has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Id.* With respect to segregability, "[t]he [agency's] conclusion on a matter of law is not sufficient support for a court to conclude that the self-serving conclusion is the correct one." *Stolt-Nielsen Transp. Grp., Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008). The agency "should [] describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document," to ensure that "both litigants and judges will be better-positioned to test the validity of the agency's claim that the non-exempt material is not segregable.") *Mead Data Cent.*, 566 F.2d at 261.

ODNI provides only the brief, conclusory statement that "[n]o information in this record could be segregated and released to Plaintiff." (Gaviria Decl. ¶ 51.) While it is admittedly unlikely that screenshots of the databases contain any non-exempt, reasonably segregable information, it is nonetheless possible, and the court cannot accept such a cursory "conclusion on a matter of law." *Stolt-Nielsen Transp. Grp.*, 534 F.3d at 734. Out of an abundance of caution, the court will deny summary judgment to ODNI and direct the agency to submit a supplemental declaration describing in more detail the agency's review for reasonably segregable information.

## H. Education

Education concluded that it "would not have agency records regarding any steps taken to investigate or authorize Secretary DeVos for access to classified information" because it does not conduct background investigations for cabinet secretaries or nominees for the position. (Senecal Decl. ¶¶ 7–8.) Stein attempts to distinguish this case from those in which courts upheld agency refusals to search because the agency played no role in the activity that was the subject of the FOIA request. (Pl. Opp. at 20–21); *see, e.g.*, *MacLeod v. United States Dep't of Homeland Sec.*, No. 15-1792, 2017 U.S. Dist. LEXIS 153651 (D.D.C. Sept. 21, 2017) (refusing to search for records regarding issuance of a diplomatic visa because the agency played no role in issuing such visas); *Jenkins v. D.O.J.*, 263 F. Supp. 3d 231 (D.D.C. 2017) (upholding agency decision not to search for records on state criminal cases because the agency had no involvement in the relevant cases). While Stein concedes that this case "is arguably close[] to the[se] examples," he asserts that it is nonetheless distinguishable because, unlike the agencies in *MacLeod* and *Jenkins*, "Education has a definite need to discuss the question of the Secretary of Education's security clearance with the agencies performing the investigation and adjudication." (Pl. Opp. at 21.)

The declaration submitted by Lisa Senecal, Education's Director of Personnel Security and Emergency Preparedness, fails to "show beyond material doubt . . . that [Education] has conducted a search reasonably calculated to uncover all relevant documents." *Weisberg*, 705 F.2d at 1351. Senecal's brief declaration is conclusory; it states that Ronald Luczak, Education's former Office of Security, Facilities, and Logistics Director, who "had knowledge about background investigations due to his position," informed Education's FOIA Service Center that the agency had no records responsive to Stein's request. (Senecal Decl. ¶¶ 4–5, 8.) But Luczak, who no longer works in the Office of Security, Facilities, and Logistics, did not prepare the declaration. (*Id.* ¶ 6.) Unlike the declarant in *American-Arab Anti-Discrimination Committee*, Senecal does not provide enough information from which the court can "presume[]" that she was "able to familiarize [herself]" with the agency's response to the request, which courts have required when a refusal to search is based on a conclusory declaration. *Am.-Arab Anti-Discrimination Comm.*, 516 F. Supp. 2d at 88.

Senecal's lack of personal knowledge about background investigations, combined with the reasonable possibility that Education possesses responsive records of discussions with investigating agencies about the processing of Secretary DeVos's security clearance, precludes summary judgment for Education. The court will thus deny Education's motion, deny Stein's cross-motion, and direct the agency to submit another declaration more specifically explaining the basis for its determination that a search for responsive records would be futile.

## I. **State**

Stein does not challenge the adequacy of State's searches in response to his investigation requests. (Pl. Opp. at 8.) He only alleges that State improperly withheld a single responsive record, Document No. 17. (*Id.* at 27 n.12.) State concluded that this document, an "adjudicative

analysis worksheet" compiled for Rex Tillerson's background investigation, was protected from disclosure pursuant to Exemptions 6 and 7(C), and withheld it in full.  (ECF No. 22-12, Ex. 1 ("State *Vaughn* Index") at Doc. No. 17.)  The worksheet "contains information regarding whether Secretary Tillerson's background investigation revealed any issues of adjudicative concern in the determination of eligibility for access to classified information."  (*Id.*)  State, in its *Vaughn* index entry, asserts that "the release of information gathered during the course of Secretary Tillerson's background investigation could subject him to unwanted attention or harassment, interests that would outweigh any minimal public interest in weighing these specific details."  (*Id.*)

State's explanation for withholding Document No. 17 is inadequate for two reasons.  First, it fails to demonstrate that disclosure of this information would constitute an unwarranted invasion of Tillerson's privacy.[11]  A comparison with *Assassination Archives & Research Center, Inc. v. CIA*, 720 F. Supp. 217 (D.D.C. 1989), *aff'd*, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990), supports this conclusion.  There, the court found that Exemption 6 protected from disclosure "a summary of personal information contained in a security file, compiled for purposes of determining [a person's] suitability for access to classified information."  *Id.* at 221.  The agency's *Vaughn* index entry in *Assassination Archives* described why the information would violate the subject's personal privacy—namely, "by revealing details of their actions and whereabouts."  *Id.*  Here, State offers no comparable description of which "details regarding the adjudication of [Tillerson's] background investigation" support its conclusory statement that

---

[11] Stein does not appear to challenge State's withholding Tillerson's date and place of birth in Document No. 17, or withholding the names of Bureau of Diplomatic Security employees who worked on the background investigation.  *See* Pl. Opp. at 27.  This information would be exempt from disclosure under Exemptions 6 and 7(C).

disclosure "could subject him to unwanted attention or harassment." (State *Vaughn* Index at Doc. No. 17.) State has thus failed to present sufficient factual evidence "explain[ing] the specific reason for nondisclosure." *Milton*, 783 F. Supp. 2d at 58.

Second, Defendants' claim that Document No. 17 "would [not] shed any light on the activities of government" is unavailing. The relevant public interest lies in revealing information about State's participation in the security clearance process for Tillerson. It stretches logic to claim that a document containing "information regarding whether Secretary Tillerson's background investigation revealed any issues of adjudicative concern" will not shed light on the activities of the adjudicating agency. (ECF No. 22-12, Ex. 1 ("State *Vaughn* Index") at Doc. No. 17.) Without evidence that such details would implicate privacy interests, it is quite possible that some of the information in Document No. 17 would not be exempt from disclosure. *See Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1328 (D.C. Cir. 2000) (holding that "Exemption 7(C) does not necessarily cover all 'investigative details'—a category presumably distinct from, and potentially far broader than the 'names of individuals/personal information'").

As it stands, the court does not have enough information to fully determine the privacy interests in Document No. 17 and weigh them against the public interest in disclosure. Accordingly, the court will deny State's motion, deny Stein's motion, and direct the agency to submit a supplemental *Vaughn* index and/or declaration to address the current deficiencies. The court will withhold ruling on State's segregability determinations with respect to Document No. 17, given that State's determinations may change as a result of the court's ruling on the withholding.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment will be GRANTED in part and DENIED in part, and Plaintiff's cross-motion for partial summary judgment will be GRANTED in part and DENIED in part.

A corresponding Order will follow shortly.


Date:  April 14, 2020


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge